**Francisco De Caso  Ph.D., LEED A.P.**

5804 Leonardo St.
Coral Gables, FL, 33146
Ph: 305-450-9291

September 24, 2020

Aronfeld Trial Lawyers

1 Alhambra Plaza, Penthouse

Coral Gables, Florida 33134

RE:  DEBRA ROBERTS v. CARNIVAL CORPORATION.

Dear Mr. Spencer M. Aronfeld,

This statement letter provides my opinions relevant to the incident involving Ms. Debra Roberts and Carnival Corporation, as referenced in Case No. 1:19-cv-25281 of the US District Court Southern District of Florida. It is understood on June 1, 2019 while Ms. Debra Roberts was walking down the hallway on Deck 5 towards the piano bar area on board the Carnival Vista vessel, she tripped and fell on a threshold suffering severe injuries.

This statement letter is based on information currently available to me, and if additional information is subsequently provided, I reserve the right to amend or supplement my opinions. Documents aided in the preparation of this letter are referenced within Annex A. The opinions contained herein are based on my professional knowledge and training, as summarized in Annex B. I disclose no known conflict of interest with known parties. Although no vessel inspection was possible to be conducted, the following can be inferred based on a reasonable degree of scientific certainty based on the available documentation, threshold schematics and well-established body of knowledge related to trip and falls:

1. Figure 1 and 2 show the schematic of fire door vertical cross-section wit the floor detail, and the threshold cross-section that Ms. Roberts tripped and fell, respectively. Figure 3 shows the actual hallway and threshold where the trip and fall incident occurred on Deck 5 on board the Carnival Vista, before and after a guarantee modification. Based on the schematic the threshold has an overall height of 0.71 inches. The schematic does not show how the threshold is secured to the floor substrate, neither it shows or references any sealants or other materials (typically used for fire doors), which may result in a higher overall installed threshold condition.

2. Figure 3 shows that the threshold was replaced after a guarantee, where also the initial threshold (Figure 3a) had a modification using a black "anti-skid" tape placed thought the length of both edges as well as a resin/silicon material. It should be noted that an anti-skip tape did not

address the root cause of the dangerous condition caused by the threshold, as the recorded incidents are caused by tripping - not slipping. Those in control of the maintenance and pedestrian safety of the vessel were aware that this initial threshold was a dangerous condition and a "trip hazard" as stated by the Staff Captain during staff meetings dating back to summer 2016, and was indeed "common topic by the attendees was the high threshold on guest areas."

3. After continued trips, near falls, and trip and falls this initial threshold was replaced through a guarantee claim to the threshold shown in Figure 3b. This was the threshold where Ms. Debra Roberts tripped and fell. As reflected in meeting minutes, accidents continued and "alternative remedies" were being considered, as "challenges regarding accidents on FSD thresh hold on …. Deck #5 ramps," and was also identified as a "hot spot area" with number of accidents rising.

4. A "Fluorescent sticker" was placed on the threshold; nevertheless, by January 2017, the Staff Captain acknowledged that "near miss" accidents occurred after "I stand there for a couple of minutes." Once again those in control of the vessel knew that the dangerous condition persisted. It should be noted that florescent materials are only effective in the dark.

5. It is also noted that Carnival's accident reporting criteria for the completion of an *Infoship Accident Report* is based on the severity of the injury after an accident.  Thus, there is no actual count nor monitoring of near-trip and falls, or falls without significant associated injuries related to this threshold or equivalent ones. Nevertheless, there are nearly two dozen reported trip and fall incidents, a reflection that the dangerous condition for pedestrians persisted.

6. By March 2017, a "square piece of carpet just before the threshold" was placed as a temporary measure aimed at reducing the risk of tripping and falling, this carpet is observed in CCTV. It is noted that the carpet did not cover the full length of the threshold, and was placed in the middle of the hallway over the threshold and did not appear to be secured to the floor deck in any way. Accidents continued thereafter, with Housekeeping crew stating that the threshold "is usually prompt to accidents" and the installation of signs were discussed and suggested multiple times, but never implemented.

7. It is evident that all previously described  and implemented measures by those in control of the vessel were temporary in nature, and never addressed the root cause of the dangerous condition. In fact, there is no evidence that an actual root cause analysis and evaluation was performed, nor professionals engaged in the process to assess the dangerous condition of the threshold and provide adequate pedestrian safe recommendations - addressing the root cause; which one of the main reasons is that the threshold exceeds the maximum height allowed of 0.50 inch, a known limit for door thresholds as referenced by ADA (ADA, 2010), as discussed further below.

8. Raised thresholds and changes in floor level are known to be a dangerous tripping hazard (Marletta 1991, Dusek 2011, Di Pilla, 2016). In fact, the building code (IBC 2018) implemented

through the US, establishes that vertical changes on a flat floor surface cannot exceed the maximum permitted vertical change in level of 0.25 inch, due to the dangerous tripping condition just a change it is well known to cause. The purpose of referencing land based codes such as the IBC is to show what passenger's expectations are when onboard a large cruise ship, in terms of pedestrian access and mobility. Such expectations are the same to the ones experience in buildings and on land structures.

9. Recommendations as discussed by the Shipboard Management to address the dangerous condition included installation of LED lighting to increase visibility, carpet installation in the thresholds incline and decline, and warning signs installations, however it appears that the none of the recommendations were ever implement. The only temporary remedy of placing a carpet on a segment of the middle length of the threshold as discussed before remained. This  type of recommendation and implementation by Shipboard Management team is a reflection of the lack of understanding as it did not address the dangerous condition.

10. In fact, Ms. Roberts tripped and fell near the hallway wall on the segment of the threshold that did not have the carpet segment. The use of a carpet placed over a segment of the threshold is considered unsafe since it was not attached or secured to the floor, did not cover the full threshold, and for a high traffic pedestrian area is not feasible; moreover the carpet hides the condition of the change in vertical elevation, interfering with the gait cycle of a pedestrian, which is discussed further below.

11. It must be pointed out that, a recent publication by the Protection and Indemnity Club (UK P&I 2016), Carnival Corporation is a member; stresses the importance and effectiveness of 'hazard markings' on vessels, by paining edges, corners and other hazards. As stated in the document, hazard markings are used when all surfaces have "the same color, hiding trip hazards." Therefore, highlighting hazards with contrasting paint is of particular important to ensure safety on vessels for new and experienced crew, as well as passengers (Lois et. al. 2004, Jensen 2005, Dahl 2010).

12. To this end, the surface floor pattern located on Deck 5 hallway with black and white tiles (as seen in Figure 3) in fact hides and disguises the dangerous trip hazard posed by the threshold, due to the poor lack of contrast between the floor and threshold, and is one reason for the dangerous condition. Placing a carpet covering the threshold would have a reverse effect, and detrimental to pedestrian safety. On the other hand, highlighting the threshold with contrasting paint or a warning sign should have been implemented. Figure 4 shows an example from a cruise ship door threshold with a caution sign that reads ' WATCH YOUR STEP' installed on a 0.5 inch raised threshold. However, those in control of the vessel and pedestrian safety failed to implement strategies that should have been known and available.

13. Furthermore, although it was discussed as a temporary measure, no warning signs on a stand or attached to the hallway wall alerting to watch your step, such as those presented in Figure 5, were ever implemented. This type of high visibility signs are known to reduce the risk of surface tripping and falling hazard conditions (Manning 1983, Jensen 2005, Dusek 2011, P&I 2016, Di Pilla 2016). Such signs are and effective and immediate tripping and falling preventative solutions that could have significantly reduced the likelihood of Ms. Roberts incident from happening, but those in control of the safety of the vessel failed to implement.

14. Furthermore, providing visual contrast at leading edges due to vertical changes on the floor is in fact a building code requirement (IBC 2018), as it is a known dangerous condition resulting in tripping(Manning 1983, Lois 2004, Di Pilla 2016, UK P&I 2016, Aziz and Stephen 2011). Besides, it is a widely adopted best practice to provide visual contrast to reduce the risk of tripping that is known to lead to serious injuries for which there are readily available solutions, as for example seen in Figure 6, depicting a commercially rated threshold with an integrated high visibility strip.

15. Additionally, the visual environment and lighting is another reason that may have contributed to Ms. Roberts trip and fall incident. Significant research has demonstrated that common contributing causes for trip and falls are due to poor lighting levels (Lee-Jean et. al. 1995, Gauchard et al. 2001, Dusek 2011, Di Pilla 2016). The Illuminating Engineering Society of North America (IES 2000) recommends specific lighting levels to provide safe pedestrian access based on the use of each space. It is surprising that those in control of the pedestrian safety of the vessel did not consider nor discuss modifying the existing environmental lighting settings of the hallway where the dangerous threshold was located. This is evidence that those providing recommendations did not have the necessary background related to pedestrian safety to adequality address the root causes the numerous trips and falls cause by threshold.

16. Furthermore, glare, flashing, and/or artificial lighting color changes are known to be  a common lighting problem, and may have also been a contributing factor in Ms. Roberts incident due to changing light originating at 'the dreamscape' seen in Figure 3b. Artificial lighting color changes, interfere with the ability to see, where on the one hand generates a distracting condition for a pedestrian, and on the other changes the visual depth of perception due to the changing light color (i.e. wavelength), which may also result in visual discomfort (Fothergill et al. 1995, IES 2000, Veitch 2001, Dusek 2011, Di Pilla 2016).

17. Once again, those in control of the vessel did not consider when providing recommendations in order to reduce the risk of tripping and falling, the option to adjust artificial light sources in and around the threshold.

18. On the other hand, handrails were not observed from deck 5 schematics or available photos of the incident location. It should be noted IMO MSC/Cir 735, Section 13 (IMO 1996) states: "There

should be handrails at a height 90 cm above the floor, preferably on both sides of the corridors… Handrails should have a color contrasting the background…" Handrails are known to reduce tripping and falling accidents, especially in the elderly population in cruise vessels, and where there are vertical changes in floor elevation (such as those caused by thresholds). It is not apparent that the Carnival Vista has any handrails in the deck 5 corridor.

19. The persistent dangerous condition caused by the threshold can also be explained by understating the mechanics of walking - the gait cycle. When a person walks, both legs are utilized alternately to provide support and propulsion, with at least one foot being in contact with the ground at all times. Gait refers to the manner of walking, rather than the actual walking process. The gait cycle is the time interval and motion between the exact same repetitive events of walking as depicted in Figure 7 (Dadashi et. al. 2014).

20. The important observation in the gait cycle is the changes in vertical clearance of the gait assuming a flat surface (Figure 7). The deviation from normal gait variation, especially in elderly individuals, translates to slower walk, with longer periods of double support, talking shorter steps, and more importantly less vertical displacement (Öberg et al. 1993). To this end, if there is a vertical change in height, (such as the elevated threshold under evaluation), it would turn in to an obstacle. Hence the obstacle becomes a hazardous tripping element, where the threshold on Deck 5 exceeded ADA established maximum height limits, as previously mentioned (ADA 2010).

21. To overcome and correct the dangerous condition, the selection and installation of a code compliant threshold - with a maximum height of 0.5 inch – should have been considered, as for example the one represented in Figure 8, and/or clearly marking the dangerous condition, and/or adjusting artificial lighting conditions as previous mentioned.

In summary, it is more likely than not, that the incident experienced by Ms. Debra Roberts would have been prevented, if those in control of the maintenance and pedestrian safety of the Carnival Vista had not failed to implement adequate safety strategies through proper root cause evaluation and analysis processes, and corrective or preventative actions in order to reduce the associated risk of tripping and falling by the known dangerous condition of the threshold.

Please do not hesitate to contact me if you have further questions.

Sincerely,

Francisco De Caso, Ph.D., LEED A.P.

### ANNEX A: List of documents reviewed, figures and references

***Documents and files reviewed***

- Defendant, Carnival corporation's, privilege log
- Defendant's answers to plaintiff's interrogatories
- Defendant, Carnival corporation's, responses to Plaintiff's first request for production
- Redacted meeting minutes of hess action team (hat) – hmp-1003-a2
- Minutes of accident investigation focus team
- Defendant, Carnival corporation's, supplemental responses to Plaintiff's first request for production
- Defendant, Carnival corporation's, supplemental responses to Plaintiff's first request for production
- Defendant's supplemental answers to Plaintiff's interrogatories
- Ship guest safety action plan – Carnival Vista (03/08/2017 - 03/11/2017)
- Plaintiff's first request for production to Defendant
- Plaintiff's initial responses to Defendant's first request for production
- Plaintiff's initial answers to Defendant's initial interrogatories to Plaintiff
- Plaintiff's second supplemental responses to Defendant's first request for production
- Transcript of videotaped deposition of Suzanne Vazquez
- Transcript of virtual deposition of Debra Roberts

***References***

ADA, ADA Standards for Accessible Design. Washington, D.C.: Dept. of Justice, 2010

Aziz, Omar, and Stephen N. Robinovitch. "An analysis of the accuracy of wearable sensors for classifying the causes of falls in humans." IEEE transactions on neural systems and rehabilitation engineering 19, no. 6 (2011): 670-676

Dahl, Eilif. "Passenger accidents and injuries reported during 3 years on a cruise ship." Int Marit Health 61.1 (2010): 1-48

Di Pilla, S., 2016. Slip, trip, and fall prevention: A practical handbook. CRC Press.

Dusek, Glenn. "Smart Safety Design to Prevent Slips, Trips and Falls." ASSE Professional Development Conference and Exposition. American Society of Safety Engineers, 2011.

F. Dadashi, B. Mariani, S. Rochat, C. J. Büla, B. Santos-Eggimann and K. Aminian. "Gait and Foot Clearance Parameters Obtained Using Shoe-Worn Inertial Sensors in a Large-Population Sample of Older Adults." Sensors 2014, 14(1), pp. 443-457

Fothergill, J., O'DRISCOLL, D. and Hashemi, K., 1995. The role of environmental factors in causing injury through falls in public places. Ergonomics, 38(2), pp.220-223

Gauchard, G., et al. "Falls and working individuals: role of extrinsic and intrinsic factors." Ergonomics 44.14 (2001): 1330-1339.

IBC-2018, International Building Code, International Code Council (ICC).

IES Lighting Handbook. 2000, 10th ed. Illuminating Engineering Society of North America

International Maritime Organization (IMO) Maritime Safety Committee Circular 735 (MSC/Cir 735), "Recommendation On The Design And Operation Of Passenger Ships To Respond To Elderly And Disabled Persons' Needs." June 24, 1996.

Jensen, Olaf C., et al. "Non-fatal occupational injuries related to slips, trips and falls in seafaring." American journal of industrial medicine 47.2 (2005): 161-171

Lois, P., et al. "Formal safety assessment of cruise ships." Tourism Management 25.1 (2004): 93-109

Manning, D.P., 1983. Deaths and injuries caused by slipping, tripping and falling. Ergonomics, 26(1), pp.3-9

Marletta, W., 1991. Trip, slip and fall prevention. The Work Environment, 1, pp.241-261.

Risk Focus: Slips, Trips and Falls, 2016 UK Protection and Indemnity (P&I) Club publication, Managed by Thomas Miller.

T Öberg, A Karsznia, K Öberg. "Basic gait parameters: reference data for normal subjects, 10-79 years of age.' Journal of rehabilitation research and Development Vol. 30, No. 2, 1993 pp. 210-223,

J. A. Veitch. "Lighting Quality Contributions from Biopsychological Processes." Journal of the Illuminating Engineering Society. Winter 2001, pp. 3–16

*Figures*



Figure 1 – Schematic of fire door vertical cross-section showing floor detail, where the numbers indicate: 2 – Sill, 25 – sill cover, and 26 - long tenon (From Schematics-Annex 2)



Figure 2 – Schematic of threshold cross-section, where numbers indicate: 3 - cover sill, 2 - door sill, and 4 – tenon. (From Schematics-Annex 3)



(a)



(b)

Figure 3 – Threshold on deck 5 hallway on Carnival Vista, where Ms. Roberts' trip and fall incident occurred: (a) initial threshold; and (b) replacement after guarantee claim



Figure 4 – Raised door threshold on a cruise ship with a 'WATCH YOUR STEP' caution sign



Figure 5 – Example of used caution signs to reduce surface tripping and falling hazard conditions



Figure 6 – Example of a commercially rated threshold with an integrated high visibility strip



Figure 7 – Illustration of the heel (dotted black line) and toe (dotted light gray line) trajectories during swing phase and corresponding clearance parameters (Dadashi et. al. 2014)



Figure 8 – Threshold, meeting height maximum ADA requirements

**ANNEX B: Summary of Qualifications**

Dr. Francisco De Caso Basalo received his MEng in Civil and Architectural Engineering from the University of Bath, England (UK), and PhD in Civil Engineering with emphasis in structural engineering and material science from the University of Miami, where he currently is a Principal Scientist.

Dr. De Caso's knowledge area and research is in civil and structural engineering, including testing, evaluation and analysis of materials, systems and technologies. These activities encompass a broad spectrum of expertise related to understanding and behavior of materials and elements, characterization of different physical and mechanical material parameters, effect of aging and durability in materials, performance requirements and design related issues of the built environment.

Dr. De Caso is also the Associate Director of the Center for Integration of Composites into Infrastructure (CICI), a National Science Foundation Industry/University cooperative research center involved in technology transfer, as well as fundamental and applied research with private and public organizations. He is actively engaged in sponsored research from federal, state agencies, and private industry.

Dr. De Caso is an active member of numerous professional organizations dedicated to the development as well as review of test methods, standards, guidelines and codes amongst some are the ASTM international, International Code Council Evaluation Service (ICC-ES), American Concrete Institute (ACI), and American Society of Civil Engineers (ASCE), as well as being a Certified XL Tribometrist. Furthermore, he is the manager of the Structures and Materials Laboratory, an ISO 17025 accredited laboratory that performs testing, evaluation, analysis and design on a variety of different materials, systems, technologies and structures. A copy of his CV is available upon request, containing his education and licenses, participation in professional organizations, as well as published conference and peer reviewed papers, participation as a reviewer in high impact journal publications, relevant awards, research projects and other relevant information to demonstrate his qualifications to render opinions on the matter discussed.

## FRANCISCO DE CASO Ph.D.

# *EXPERT REPORT*

# DEBRA ROBERTS
# v.
# CARNIVAL CRUISE LINE

# CASE NO.: 1:20-cv-25281

Report Number: R200627
Date Issue: January 27, 2021

**REPORT PREPARED FOR:**
Aronfeld Trial Lawyers
Attn: Spencer Marc Aronfeld, Esq.
1 Alhambra Plaza, Penthouse, Coral Gables, Florida 33134

**SCOPE OF WORK:**
Inspection on board the Carnival Vista,
deck 5 main center corridor forward to mid-ship

**Francisco De Caso, Ph.D.**
5804 Leonardo St., Coral Gables FL, 33146 • 305-450-9291
fjdecaso@gmail.com

| Controls: | |
|---|---|
| Superseded Report | New report |
| Reason for Revision | n/a |
| Effective Date | January 27, 2021 |

**Report Approval:**

*I indicate that I have authored and reviewed this report and agree with the contents it presents, and I approve for its release.*

Name:          Francisco De Caso, Ph.D., LEED A.P., CXLT

Signature:

Date:          January 27, 2021

This document and its contents are the work of Francisco De Caso. The document should only be duplicated and/or distributed in its entirety. The document may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this document are based upon the data and information available to at the time of its issue and may be subject to revision as additional information or data becomes available.

**TABLE OF CONTENTS**

| SECTION | TITLE | PAGE |
|---------|-------|------|
| **1.** | **INTRODUCTION** | **4** |
| *1.1.* | *PURPOSE OF REPORT* | *4* |
| *1.2.* | *REPORT PREPERATION* | *4* |
| *1.3.* | *QUALIFICATIONS* | *4* |
| *1.4.* | *DOCUMENTATION* | *5* |
| *1.5.* | *REPORT REQUETSED BY* | *5* |
| **2.** | **INSPECTION** | **6** |
| *2.1.* | *COMPLAINT* | *6* |
| *2.2.* | *VESSEL BACKGROUND* | *6* |
| *2.3.* | *SCOPE OF EVALUATION* | *6* |
| **3.** | **METHODOLOGY** | **7** |
| *3.1.* | *SCOPE OF ANALYSIS* | *7* |
| *3.2.* | *PROBLEM DEFINITION* | *7* |
| *3.3.* | *HYPOTHESIS* | *7* |
| *3.4.* | *DESIGN OF EXPERIMENTS* | *8* |
| *3.5.* | *EVALUATION* | *8* |
| *3.6.* | *OPINIONS* | *8* |
| **4.** | **EVALUATION** | **9** |
| *4.1.* | *VISUAL ANALYSIS* | *9* |
| *4.2.* | *THRESHOLD EVALUATION* | *12* |
| *4.3.* | *ILLUMINANCE EVALUATION* | *16* |
| **5.** | **OPINIONS** | **18** |
| *5.1.* | *VISUAL ANALYSIS* | *18* |
| *5.2.* | *THRESHOLD EVALUATION* | *19* |
| *5.3.* | *ILLUMINANCE EVALUATION* | *20* |
| **6.** | **CONCLUSIONS** | **21** |
| **7.** | **REFERENCES** | **22** |

**Francisco De Caso, Ph.D.**

## 1.    INTRODUCTION

### 1.1.   PURPOSE OF REPORT

This report provides supplementary findings, opinions and conclusions to those stated in the letter dated September 24, 2020, relevant to the evaluation subsequent to the inspection on board the Carnival Vista on the matter arising from the litigation relating the complaint by Ms. Debra Roberts v. Carnival Corporation (also doing business as Carnival Cruise Line) in the United States District Court Southern District of Florida, as referenced within Case No.: 1:20-cv-25281.

### 1.2.   REPORT PREPERATION

This report and its contents have been prepared by me, Francisco De Caso, Ph.D., LEED A.P., CXLT.  The opinions contained herein are based on my professional knowledge, education, and training; and are based within a reasonable degree of scientific probability.  I disclose no known conflict of interest with known parties. Preparation of this report included the review of documents related to the litigation as well as studies, standards, codes, provisions, literature and guidelines.

This report is based on the information currently available to me, and if additional information is subsequently provided, I reserve the right to amend or supplement my opinions. Documents aided the preparation of this report are referenced within the report.

### 1.3.   QUALIFICATIONS

I received my Master of Engineering (MEng) in Civil and Architectural Engineering from the University of Bath, England (UK), and my Ph.D. in Civil Engineering with emphasis in structural engineering and material science from the University of Miami, where I am currently a Principal Scientist. My knowledge area and research are in civil and structural engineering, including testing, evaluation and analysis of materials, systems and technologies. These activities encompass a broad spectrum of expertise related to understanding and behavior of materials and elements applied to the built environment, characterization of different physical and mechanical material parameters, effect of aging and durability in materials, performance requirements and design related issues of the built environment. I am also the Associate Director of the Center for Integration of Composites into Infrastructure (CICI), a National Science Foundation Industry/University cooperative research center involved in technology transfer, as well as fundamental and applied research with private and public organizations. I am actively engaged in sponsored research from federal, state agencies, and private industry. I am an active member of numerous professional organizations dedicated to the development as well as review of test methods, standards, guidelines and codes amongst some are the ASTM international, International Code Council Evaluation Service (ICC-ES), American Concrete Institute (ACI), and American Society of Civil Engineers (ASCE), as well as a Certified XL Tribometrist. Furthermore, I am the manager of the Structures and Materials Laboratory, an ISO 17025-2017 accredited laboratory that performs testing, evaluation, analysis and design on a variety of different materials, systems, technologies and structures. My CV and fee sheet, available upon request, contain my education and licenses, participation in professional organizations, as well as published conference and peer reviewed papers, participation as a reviewer in high impact journal publications, relevant awards, research projects and other relevant information to demonstrate my qualifications to render opinions to the aforementioned matter.

## 1.4.    DOCUMENTATION

The following relevant case documents regarding the aforementioned matter have been reviewed in preparation for this report:

1.4.1.    Defendant, Carnival corporation's, privilege log
1.4.2.    Defendant's answers to plaintiff's interrogatories
1.4.3.    Defendant, Carnival corporation's, responses to Plaintiff's first request for production
1.4.4.    Redacted meeting minutes of hess action team (hat) – hmp-1003-a2
1.4.5.    Minutes of accident investigation focus team
1.4.6.    Defendant, Carnival corporation's, supplemental responses to Plaintiff's first request for production
1.4.7.    Defendant, Carnival corporation's, supplemental responses to Plaintiff's first request for production
1.4.8.    Defendant's supplemental answers to Plaintiff's interrogatories
1.4.9.    Ship guest safety action plan – Carnival Vista (03/08/2017 - 03/11/2017)
1.4.10.   Plaintiff's first request for production to Defendant
1.4.11.   Plaintiff's initial responses to Defendant's first request for production
1.4.12.   Plaintiff's initial answers to Defendant's initial interrogatories to Plaintiff
1.4.13.   Plaintiff's second supplemental responses to Defendant's first request for production
1.4.14.   Transcript of videotaped deposition of Suzanne Vazquez
1.4.15.   Transcript of virtual deposition of Debra Roberts

## 1.5.    REPORT REQUETSED BY

This expert witness report was prepared for:

Aronfeld Trial Lawyers
Attn: Spencer Marc Aronfeld, Esq.
Board Certified Trial Lawyer
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
aronfeld@aronfeld.com

## 2.    INSPECTION

### 2.1.    COMPLAINT

The complaint is related to the incident, which occurred on June 1, 2019 on board the Carnival Vista vessel in the late evening around 11.00 pm, on promenade deck (5) main center corridor between the midship and forward elevators. Based on the review of the aforementioned documents and a verbal interview with Ms. Debra Roberts prior the vessel inspection (as referend herein), it can be inferred that while the Carnival Vista was underway, Ms. Debra Roberts on her first evening on board the Carnival Vista while making her way aft to meet her family members, on the Promenade deck, and her foot got caught, and as a result tripped on a floor threshold and fell, suffering serious injuries. Figure 1 shows the incident location based on the vessel deck plans. To this end, the area around the threshold on deck 5 towards mid-ship, where the incident occurred, was inspected to form supplementary opinions and determine the likelihood of the potential causes of the subject incident.

### 2.2.    VESSEL BACKGROUND

Operated by Carnival Corporation, a Panamanian corporation also doing business as Carnival Cruise Line, the Carnival Vista (IMO No. 9692569) is the lead ship of her namesake class, which includes two additional Carnival ships, Carnival Horizon and Carnival Panorama. She is approximately 1062-feet-long with 133,596 gross tonnage and a maximum capacity for 4,977 passengers, with a crew complement of 1,450. The Carnival Vista entered service on October 2000. She entered in drydock on May 2016.

### 2.3.    SCOPE OF EVALUATION

On Wednesday January 13, 2021, at Port of Miami, Florida, after getting clearance and screening for COVID-19, starting at approximately 10.30 am, I initiated the inspection on board Carnival Vista at the aforementioned location, as indicated by the red arrow in Figure 1. The inspection lasted about 90 minutes. The overall purpose of the inspection consisted in surveying, photographing and evaluating the area of the subject incident including evaluating the overall condition of the floor threshold, geometry properties, lighting conditions, and other related environmental factors that may have influenced the aforementioned trip and fall incident by Ms. Debra Roberts.



Figure 1 – Carnival Vista deck 5 vessel elevation and plan showing inspection location (red arrow)

# 3.    METHODOLOGY

The scientific method was the methodology implemented to determine the probable cause(s) of the aforementioned complaint; as well as to support and validate the opinions and conclusions provided herein. To this end, the scientific methodology was used in this inspection and evaluation to establish or demonstrate that a particular independent variable *the cause* (i.e. what produced the trip/fall) had an influence on the dependent variable, *the effect* (i.e. the trip/fall).

## 3.1.    SCOPE OF ANALYSIS

In general, the risk of a trip/slip/fall occurring is a multimodal function and is most often due to a combination of factors. The competence press model (Lawton and Nahemow 1973) can serve as a tool to assess such risk. The model suggests that events or falls are a function of individual, environmental, and interactive factors (between of individual and the environment), represented by the equation: $B = f \{P, E, (P*E)\}$; where $B$ is the risk of a fall (*behavior*); $P$ are the intrinsic factors (*person*); $E$ are the extrinsic factors (*environment*); and $P*E$ is the product resulting from the interaction between the $P$ and $E$. Based on this model to help determine the risk of falls, and thus of probability of each factor in causing a trip/slip/fall from happening, $B$, it is necessary to evaluate $P$, $E$, and $P*E$. To this end and based on the available access of information of this cause-effect analysis in relation to the incident, $E$ is main factor under evaluation; where the role extrinsic factors related to the evidence-based evaluations are assessed herein (Gauchard et. al. 2001).

## 3.2.    PROBLEM DEFINITION

Given that trip/fall accidents are precipitated by both intrinsic and extrinsic factors as previously stated, it should be noted that this report addresses primarily extrinsic factors (i.e. environment factors). Where explicit intrinsic factors (i.e. the person, Ms. Debra Roberts) including for example her physical health, walking gait cycle, balance, stability abilities at the time of the incident are parameters out of the scope of this evaluation. The problem definition, as part of the scientific methodology, can therefore be achieved by the formulation of a question, as follows:

> ➢ What is the likelihood that extrinsic factors did not cause the trip and fall of Ms. Debra Roberts?

## 3.3.    HYPOTHESIS

The risk of tripping and falling accidents is significantly increased due to one or several extrinsic deficiencies including but not limited to: overall service condition of floor, level of floor, adequacy of maintenance, lighting conditions, surface conditions (e.g. threshold), use of preventative measures and/or best practices to reduce tripping and falling risks…etc as been demonstrated and supported by the extensive body of knowledge (Fothergill et. al 1995, Peake et. al. 1999; Lois 2004; Jensen 2005; Dahl 2010; Di Pilla 2016). In formulating the problem definition, background information can be obtained regarding the specific tripping and falling event (based on the documentation indicated in Section 1.4) combined with the abundant body of expert knowledge, which provides basis to establish the following general hypothesis:

> ➢ The cause of Ms. Debra Robert's trip and fall was not due to a combination of extrinsic deficiencies (including inadequate or defective surface condition, and/or maintenance, lighting, or use of preventative measures and/or best practices to reduce this risk).

## 3.4. DESIGN OF EXPERIMENTS

The ideal experiment to test the hypothesis would be to reproduce the incident and then modify different applicable variables and engage representative human participants to replicate Ms. Debra Roberts walking across the threshold on deck 5 and measure the number of incidents and their causes based on the variables being tested. Cleary this is not possible; nonetheless, the scientific methodology allows to evaluate variables thought onsite testing, and comparing results with the larger body of existing established and validated knowledge, standards and best practices. The experiments conducted to test the hypothesis undertaken during the vessel inspection area, including are summarized as follows:

i) **Visual Analysis:** Describe the area of the incident and record relevant environmental (extrinsic) observations to test the hypothesis.

ii) **Threshold Evaluation:** Evaluate the condition and threshold geometry present on surface at the incident location to test the hypothesis.

iii) **Illuminance Evaluation**: Evaluate the available lighting at and around the incident location to test the hypothesis.

## 3.5. EVALUATION

Refer to Chapter 4, includes the detailed information on the data collected, observations and test results conducted during the vessel inspection evaluation to test the hypothesis.

## 3.6. OPINIONS

Refer to Chapter 5, provides the interpretation and corresponding opinions based on the experimental results, references and available standards to test the hypothesis on the matter under evaluation.

## 4.    EVALUATION

The activities conducted during the evaluation of the surface on deck 5 main center corridor between the midship and forward elevators are summarized in this section. Opinions related to the evaluation activities are presented in Section 5 of this report. All measuring equipment during the inspection was conditioned prior recording measurements, providing sufficient time to ensure dimensional compensation changes due to temperature effects. Length measurements were recorded with a Leica DISTO D2 (a handheld laser distance-meter) with an accuracy of 1/16 (0.06) of an inch, a tape measure with an accuracy of 1/8 (0.125) of an inch, or a caliper with a precision of 1/1000 (0.001) of an inch, as applicable. Angle measurements were recorded with precision digital angle-measuring levels with an accuracy of 0.1-degrees, as applicable. Temperature measurements were recorded with a non-contact infrared thermometer Extech model 42530 or a humidity temperature pen model 445580.

### 4.1.   VISUAL ANALYSIS

The location of the incident under evaluation was indoors, in the main center corridor between the midship and forward elevators on deck 5 as indicated in Figure 1. The following relevant observations were made during the inspection's visual analysis. Corresponding interpretations and opinions are provided in Section 5.

4.1.1.    The corridor and location of the inspection is clearly designated by Carnival as an accessible route, as indicated in the vessel plans, shown in Figure 1 by a dotted blue line.

4.1.2.    Figure 2 shows views of the general area of deck 5 looking aft in the direction that Ms. Roberts was walking.

4.1.3.    The threshold located in the corridor is part of a fire by fire door, identified as F.S.D 5.4.08, as referenced in Figure 3.

4.1.4.    A nylon-type floor mat carpet surface with a vinyl-type backing was located in the center of the corridor just in front of the threshold, as seen in Figure 2.

4.1.5.    The floor surface consisted of an alternating pattern of black and white tiled, as seen in Figure 2.

4.1.6.    The corridor connects the elevators stacks on at the mi-ship and forward as well as main atriums of the ship, and provides interior access to the Piano Bar and Library Bar, as seen in Figure 4.

4.1.7.    The use of the corridor on deck 5 is therefore for high pedestrian traffic ranging from access for guests in and out the bars, of between the other deck 5 shops or lounge, of between elevators, as well as for emergency evacuations.

4.1.8.    There is negligible natural light levels, and all lighting is provided via artificial overhead lights.

4.1.9.    At the time of the inspection only contractors and designated crew was onboard due to COVID-19 restrictions.

4.1.10.   At the end of each corridor, in each atrium spaces there is an installation referred to as the 'Dreamscape.' It is large, three-deck-high funnel screen display. The upper part of the Dreamscape reaches to Deck 5, as seen in Figure 5.

4.1.11.   A CCTV camera was located overhead the inspection location which was monitoring the incident area as shown in Figure 6.


Figure 2 – General view of inspection area looking aft




Figure 3 – Fire door pocket and identification by threshold at inspection location



Figure 4 – Access to the piano bar and library bar by inspection location



Figure 5 – Dreamscape at mid-ship atrium looking aft



Figure 6 – CCTV camera monitoring the incident area

## 4.2.   THRESHOLD EVALUATION

An evaluation to determine quantitatively the size and obstruction represented by threshold at the incident location was undertaken. The evaluation was performed using a calibrated caliper and level to determine the relative profile of the threshold to the floor surface. To this end, seven different locations on the threshold length, two feet apart, were selected and measured.  The test locations were deliberately selected to ensure adequate comparison and representative segments along the threshold length for adequate evaluation. The following relevant threshold evaluation observations were made.

4.2.1.   The threshold had a total length of 204 in. and width of 8.5 in. Refer to Figure 7 showing the overall threshold looking in the direction that Ms. Roberts was walking at the time of her incident (aft) and forward, showing the seven measurement locations.

4.2.2.   The threshold was mechanical fasten to the floor surface with screws, and was composed of two segments as seen in Figure 8, showing the detail of the threshold screws and middle where the two segments met.

4.2.3.   The schematic of threshold cross-section reported in Figure 9, provides the measurements taken at each location, which included: the height, slope and gap depth of both the front and back of the threshold, the width. The floor surface level was also measured immediately on the front and back of the threshold for reference purposes. Table 1 provides the tabulated measurements.

4.2.4.   The threshold relative front and back edges were sealed to the floor surface with a polymer type substance, which run along the entire length as see in Figure 8. The front seal width was also measured and reported in Table 1.

4.2.5.   This polymer seal was fully missing as well as fully detached in segments of the front of the threshold, as seen in Figure 10.

4.2.6.   The average height of the threshold relative to the floor surface was 0.764 in.

4.2.7.   The average front slope of the threshold relative to the floor surface was 21.2-degrees.

Table 1 – Threshold tabulated measurement results

| Measurement ID# | Height (Front) [in.] | Height (Back) [in.] | Slope (front) [°] | Slope (back) [°] | Gap Depth (Front) [in.] | Gap Depth (Back) [in.] | Seal Width (Front) [in.] | Illuminance at Threshold level [lux] | Illuminance 36 in above Threshold level [lux] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0.742 | 0.821 | 21.4 | 18.4 | 0.300 | 0.298 | 0.830 | 68.9 | 38.5 |
| 2 | 0.801 | 0.827 | 22.7 | 20.1 | 0.298 | 0.302 | 0.820 | 151.5 | 119.4 |
| 3 | 0.761 | 0.780 | 22.2 | 17.9 | 0.301 | 0.302 | 0.816 | 105.3 | 96.7 |
| 4 | 0.710 | 0.753 | 19.5 | 17.8 | 0.300 | 0.305 | detached | 59.7 | 43.4 |
| 5 | 0.802 | 0.735 | 20.0 | 16.5 | 0.306 | 0.297 | not present | 49.5 | 40.6 |
| 6 | 0.716 | 0.884 | 21.1 | 19.2 | 0.313 | 0.299 | 0.836* | 43.8 | 38.4 |
| 7 | 0.814 | 0.779 | 21.3 | 17.5 | 0.282 | 0.311 | 0.829 | 38.7 | 32.5 |
| **AVERAGE** | **0.764** | **0.797** | **21.2** | **18.2** | **0.300** | **0.302** | **0.826** | **73.9** | **58.5** |

*seal color change

Roberts v. Carnival
Document Number: R200627
**Expert Report**



(a)



(b)

Figure 7 – Threshold under evaluation looking (a) aft, and (b) forward)



Figure 8 – Detail of the threshold under evaluation



Figure 9 – Schematic of threshold (green outline)
indicating measurements (red arrows) recorded during inspection



Figure 10 – Polymer seal in the front of the threshold detached or missing,

## 4.3.    ILLUMINANCE EVALUATION

An evaluation to determine quantitatively the level of artificial lighting at the incident location was conducted. Poor visibility of interior spaces can lead to misreading the surface, where any changes in level or edges can cause faulty foot placement and result in a tripping and falling accident (Veitch 2001, Di Pilla 2016). Proper lighting in areas where there are changes in the floor level such as those provided by thresholds, is therefore critical to ensure that the safety of the passengers and crew is maintained. To this end, an illumination survey measuring the artificial lighting was performed.

The survey measured the levels of horizontal lux, known as the illuminance and luminous emittance levels, provided by the interior artificial lights. The lux provides a measure of the intensity, as perceived by the human eye, of light that hits a surface. The lux was measured using a white LED light meter, Model LT40 by Extech Instruments. Measurements were performed: i) on the threshold at the floor surface at each of the seven different locations as indicated in section 4.2; ii) At waist height, 36 in. above the threshold at the seven locations; and iii) At waist height, 36 in. above floor surface in the corridor area prior the threshold (forward), refer to Table 1. A square grid pattern 60 in by 60 in, 40 inches from either the corridor side walls was implemented with a total of 18 data points. The following was established from the illumination survey. Interpretations of the stated observations are provided in Section

- 4.3.1.    The corridor had artificial light sources located in the ceiling as seen in Figure 11, looking forward.
- 4.3.2.    At the start of the inspection the corridor artificial light sources was limited. Upon request, the artificial lights were turned on to reproduce the same lighting levels as if passengers were on board. Due to the location of the inspection, a crew member confirmed that the lighting levels are constant in this area of this ship, and thus the lighting levels provided did indeed assimilate to normal conditions when passengers are onboard.
- 4.3.3.    It was noted that some light sources were not operational, as seen in Figure 11.
- 4.3.4.    The average illuminance at the threshold floor level was 73.9 lux, with a maximum value of 151.5 lux and a minimum value of 38.7 lux.
- 4.3.5.    The average illuminance at waist height above the threshold was 58.5 lux, with a maximum value of 119.4 lux and a minimum value of 32.5 lux
- 4.3.6.    The average illuminance in the corridor area prior the threshold at waist height was 186 lux, with a maximum value of 373 lux and a minimum value of 44.3 lux.

Roberts v. Carnival
Document Number: R200627
**Expert Report**



Figure 11 – Artificial light sources in corridor prior (in front) of the threshold

## 5.   OPINIONS

The results and evidence obtained from the inspection conducted on January 13, 2021, at Port of Miami, Florida, on board the Carnival Vista, on promenade deck (5) main center corridor between the midship and forward elevators, in relation to the trip and fall incident by Ms. Debra Roberts, which occurred on June 1, 2019; are discussed and interpreted in this section. The opinions provided herein consider the plausible extrinsic cause(s) contributing to the subject incident based on evidence, standards, applicable requirements, established scientific knowledge, and guidelines relevant to this matter. The hypothesis being tested relevant to this incident is re-referenced below:

> ➢ The cause of Ms. Debra Robert's trip and fall was not due to a combination of extrinsic deficiencies (including inadequate or defective surface condition, and/or maintenance, lighting, or use of preventative measures and/or best practices to reduce this risk).

5.1.   VISUAL ANALYSIS

From the visual analysis and supporting documentation the following can be inferred:

5.1.1.   The location of the incident is classified by the defendant, Carnival, as an accessible route, which in turn explicitly implies it must meet ADA requirements (ADA 2010).

5.1.2.   The floor mat located in the corridor during the inspection did not cover the full length of the threshold (width of the corridor), where only the middle of the corridor floor and long edge of the floor mat was partially covering the threshold at the time of the inspection.

5.1.3.   *Floor mats are primarily designed for* removal of dust, dirt, and moisture from the footwear, while reducing slips, trips and falls; thus floor mats are typically used in *high traffic areas (entrance/exits/transition). In order for the floor mats to be effective, the arrangement for this type of mats needs to strategically cover natural and expected pedestrian paths (Di Pilla 2016). As such, the use of the floor mat on deck 5 of the Carnival Vista did not meet this well-established and safe practice for the adequate arrangement for floor mats*.

5.1.4.   The current existence of a floor mat in the center of the corridor implies that since 2017 the temporary measure aimed at reducing the risk of tripping and falling, remains, and no permanent best practice measures to resolve this known hazardous condition has been adopted, as previously stated. (UK P&I 2016, Di Pilla 2016). No signs have been installed as it is done in other Carnival vessels placed directly on, or when approaching thresholds, even though based on the case documents, signs were discussed and suggested multiple times. As of the inspection date still has not been implemented.

5.1.5.   The floor tile pattern does not provide significant contrast between the floor level surface and the raised threshold, this more likely than not will result in a camouflaging effect of the threshold (due to the contrast and lighting conditions, as referenced in other sections), and the reason why in such bases best practices recommend to provide contrast with signs or color contrast, since it is well. established that passengers new to any vessel are especially vulnerable to trips and falls due to their nonfamiliarity with the layout of the vessel (UK P&I 2016, Di Pilla 2016).

5.1.6.   The 'Dreamscape' did display images that contained motion, color, flashing, and contrasting changes of light from dark to light. This display is intended to be a key focus feature; thus, those in control of the maintenance of the vessel should have been aware of the added distraction caused Dreamscape to pedestrian, and needing to provide a permanent solution to the known dangerous condition caused by the threshold (IES 2000, Veitch 2001, Di Pilla 2016, IEN).

## 5.2.   THRESHOLD EVALUATION

From the threshold evaluation the following can be inferred:

5.2.1.   The threshold under evaluation did not meet ADA (ADA 2010) requirements, exceeding the average maximum allowable level change by nearly 60%. ADA does not permit level changes in excess of 0.25 in. with a vertical level change, or a maximum of 0.5 in with a bevel edge no greater than 1:2, typical in threshold applications as represented in Figure 12.

5.2.2.   There was clear evidence of lack of maintenance due to the poor condition of the seal along the length of the threshold between the threshold of the floor surface as seen in Figure 10. Moreover the loose segment of the seal can cause another hazardous condition that has not been addressed; while the lack of seal as seen, exposes the sharp edge condition of the threshold, which further increases the risk of tripping an falling, as it was noted and identified during the crew meeting minutes from prior reported incidents.

5.2.3.   It is recognized that significant changes in elevations, especially in transitioning paths such as corridors, are a dangerous condition that when exceeding 0.5 inches, increases significantly the risk of falls (Anderson 1983, Jensen 2005, Aziz and Stephen 2011, Dusek 2011). Thus, the threshold at the corridor clearly represents a dangerous condition, confirming and reinforcing further prior opinion made.

5.2.4.   Further, the slope provided by the threshold neither meet the ADA requirement, which when changes in level greater than 0.5 in. as is the case a ramp or slope shall be used with a maximum slope of a ramp of 1:12, resulting in a maximum angle of less than 4.8-degrees. The current slope exceeds this requirement by more than 345%.

5.2.5.   While the threshold does serve as a track for the fire door, the ADA requirements and other well established limits in changes in level need can be maintained with alternative available threshold designs.



Figure 12 – Level changes requirements (ADA 2010)

5.3.   ILLUMINANCE EVALUATION

From the illumination evaluation the following can be inferred.

5.3.1.   Based on the Illuminating Engineering Society of North America (IES 2000) recommendations, the lighting levels to provide safe pedestrian access was not met at the threshold, nor at the corridor space prior the threshold.

5.3.2.   IES  recommendations for circulation types of internal corridors/hallways spaces typically have an average maintained level of 215 lux (20 foot-candle). This level is typically higher in 'general retail spaces' for which this corridor space may be designated due to the other services available on deck 5, or more critically due to the light-variation condition generated by the Dreamscape, needing a higher average maintained level of 538 lux (50 foot-candle) (IES 2000) to ensure safe pedestrian mobility and access.

5.3.3.   Poor visibility of any space can lead to misreading the surface, where any changes can cause faulty foot placement and result in a tripping and falling accident. Proper lighting specially where there may be changes surface type or change in elevation (such as the threshold) is critical to ensure safety of the passengers and crew as well as to significantly reduce tripping and falling accident (Marletta 1991, Di Pilla 2016, IES 2010).

5.3.4.   Moreover, given the condition as a result of the Dreamscape continuous and random changing lighting and contrast, best practice would be for this area to have significantly higher level of illumination to counterbalance the effects of the Dreamscape (Di Pilla 2016). Thus reducing the risk of tripping and falling by providing more homogenous lighting.

## 6.    CONCLUSIONS

The scientific method was used to determine the cause and effect relationships of the tripping and falling incident involving Ms. Debra Roberts. The tripping and falling incident was further evaluated by conducting a vessel inspection. Based on my education, professional experience, training and understating of applicable requirements and references, guides and standards, it is my opinion within a reasonable degree of scientific probability, the increased risk of tripping and falling by Ms. Debra Roberts was due to a non-compliant ADA threshold, installed a designated and marked accessible route, resulting in an excessive vertical level change creating a hidden dangerous condition. Therefore, it is my opinion, that the hypothesis was not supported.

The surface condition caused by the threshold, coupled with the substandard and inadequate lighting conditions within the corridor and immediately around the threshold, on deck 5 of the Carnival Vista is unreasonably dangerous for a reasonable person. Moreover, there was evidence of lack of maintenance, and no resolution related to adopting permanent solutions to reduce the trip and fall risk caused by the threshold.

In summary, for the type of occupancy and exposure of the inspected deck 5 area, the hazardous condition previously mentioned was known and appreciated by those in control of the maintenance of the Carnival Vista, however did not take any action to correct or reduce the risk necessary for reasonably safe pedestrian access.

**Francisco De Caso, Ph.D.**

## 7.    REFERENCES

ADA, ADA Standards for Accessible Design. Washington, D.C.: Dept. of Justice, 2010

Aziz, Omar, and Stephen N. Robinovitch. "An analysis of the accuracy of wearable sensors for classifying the causes of falls in humans." IEEE transactions on neural systems and rehabilitation engineering 19, no. 6 (2011): 670-676

Dahl, Eilif. "Passenger accidents and injuries reported during 3 years on a cruise ship." Int Marit Health 61.1 (2010): 1-48

Di Pilla S. Slip, trip, and fall prevention: A practical handbook.(2016) CRC Press.

Dusek, Glenn. "Smart Safety Design to Prevent Slips, Trips and Falls." ASSE Professional Development Conference and Exposition. American Society of Safety Engineers, 2011.

Gauchard, G., Chau, N., Mur, J.M. and Perrin, P., 2001. Falls and working individuals: role of extrinsic and intrinsic factors. Ergonomics, 44(14), pp.1330-1339

IES Lighting Handbook. 2000, 10th ed. Illuminating Engineering Society of North America

J. A. Veitch. "Lighting Quality Contributions from Biopsychological Processes." Journal of the Illuminating Engineering Society. Winter 2001, pp. 3–16

Jensen, Olaf C., et al. "Non-fatal occupational injuries related to slips, trips and falls in seafaring." American journal of industrial medicine 47.2 (2005): 161-171

Lawton, M. P., and Nahemow, L. 1973 "Psychology of adult development and aging". Ecology and the aging process. Washington D.C. American Psychological Association

Lois, P., et al. "Formal safety assessment of cruise ships." Tourism Management 25.1 (2004): 93-109

Marletta, W., 1991. Trip, slip and fall prevention. The Work Environment, 1, pp.241-261.

Peake, Dwight Edward, et al. "Descriptive epidemiology of injury and illness among cruise ship passengers." Annals of emergency medicine 33.1 (1999): 67-72

Risk Focus: Slips, Trips and Falls, 2016 UK Protection and Indemnity (P&I) Club publication, Managed by Thomas Miller.

**♦ END OF REPORT ♦**

**Francisco De Caso, Ph.D.**